Anderson J.
delivered the opinion of the court.
By the admission of the appellants, in their answers to plaintiff’s bill, the plaintiff’s intestate, by contract with the firm of James Chieves, was entitled to receive one-fourth part of the net profit realized upon *425 the manufactured tobacco, for his services, in lieu of a fixed salary. And the tobacco which was manufactured for the California adventure by the firm, as shown by the entries in their books, was manufactured in the same way all the rest of their tobacco was, and by the firm, under the direction and management of the said Gary, and necessarily constitutes a part of the manufactured tobacco, iu the profit upon which he was entitled to share, there being no preteuce even of an agreement ou his part to except it from the contract. The contract of the appellees with Edward J. Hudson, to give him one-third of the net profits on the tobacco manufactured for the •California' adventure, although enhancing the cost of manufacture, did not authorize them to impose other terms upon Gary, without his consent; and could not deprive him of his right to the one-fourth part of the net profits realized upon that tobacco, he never having surrendered his right thereto, or changed his contract in respect to it. Was this right surrendered by his administrator, the appellant, by his contract made with the appellees, pending this suit? This is the main question. If it was not surrendered, the intestate’s estate is still entitled to one-fourth part of the profits realized by the firm on the manufactured tobacco shipped to California.
There is no express stipulation of release or surrender ■in the contract. And it can be implied, if at all, only from the direction to take the balances, as shown iu the “fictory account” and “factory balances,” as the true balances. If that language restricts the commissioner to ■the entries made under those heads of acerunt, and for•bids the correction of any errors, either by taking from, nr adding to, or changing the balances shown by those accounts, as written up, (which would be adhering very closely to the letter,) such restriction could only apply to the account for 1858 and the previous years. It could *426 not, and does not, apply to the account for 1859, which-had not been closed on the books. The accounts for 1858- and the previous years, were stated and reported to the , . court, and tl e balances, as shown m “factory account anc^ “i'aet°ry balances,” were taken as true, and showed a balance in favor of the plaintiff’s intestate of $55,281 and 50 cents, after deducting debits of 1859. To this report there was no exception, and the same was confirmed by the court; and the above balance was decreed the plaintiff; and the commissioner was directed to take-an account of the transactions between the parties, not. embraced in said report, up to the 9th of January 1860, upon the same principles which had been agreed upon for the settlement of the previous account.
Those principles were, so far as applicable to the statement of the account subsequent to 1858, that the plaintiff's intestate should be treated as an employee of the-firm, entitled to one-fourth part of the profits on the tobacco manufactured, and that his debits for the year-1859, which had r.ot been taken from the balance due on the previous account, if any, should be deducted, without interest, from his proportion of the profits, to the close off the year 1859; the balance to bear interest until paid. These were the principles upon which, by the agreement, the previous account was to be settled. And, in addition, it was stipulated that in its settlement the balances, as-shown by “factory account” and “factory balances,” should be taken as true. But such direction could not be-applicable to the account for 1859, because confessedly the accounts for that year had not been written up, and the balance was not shown ; and therefore could not be taken as true.
It was shown by “factory account” for the year 1858, that the manufactured tobacco shipped to California that year, cost the firm $29,423.38, which is credited to “fac *427 tory account.” But no credit is given for the profits real-J ized on that tobacco. “ Factory account” is credited with 7 cents a pound. But that entry was made in pursuance „ , 1 . , .. . , . of the agreement made by the appellees with Hudson, to which Gary was no party; by which they bound themselves to keep an account of that business and of the net profits, of which Hudson w-as to have one-third. They also agreed that the charge for manufacturing should not be less than 6 nor more than 7 cents a pound, which should include sweetening and flavouring. The language imports that it was the estimated cost of manufacturing; and according to the weight of evidence, it does not exceed the cost. But, be that as it may, they could not limit the profits in that way, so as to impair the right of Gary, under his contract, to the one-fourth part of the actu d profits, without his consent. It was binding only between them and Hudson. And this entry was necessary, and could only have been intended to carry out their contract with Hudson. Then, when they received the returns of sales, a deduction of the cost of the tobacco, as credited to“factory account,” from the net proceeds of sales, would show the profit; from which one-third, which they agreed to give Hudson, should be taken, as a part of the costs to the firm; and the other two-thirds should be credited to “factoiy balances,” or carried to “profit and loss,” which is in effect the same; and out of which, as the profit on manufactured tobacco, Gary, by his admitted contract, was entitled to one-fourth.
But the factory account for 1858 did not show this balance, and the balance shown by it was to be taken as true. If no sales had been made of this year's shipments, or if the account and proceeds of sales had not been received by the close of the year 1858, no profit had been realized upon this tobacco at that time; and by the terms *428 of the agreement with Garv, as it is set out hv the anpel- , & , , • J 11 lees, he was only entitled to a share of the profits rea ¿¿red. no entry of profits could be credited to “factory balances ” until returns were received. Until then Gary was 110t enti^e<^ to be credited with his share of the net profits. “Factory accouuts” is not credited with the shipments until December 1858, and it is therefore evident that the profits could not be realized in time to entitle Gary to a credit for his one-fourth part by the 31st of December 1858, when the “factory account” for the year -was closed on the books. Uo profit having been realized, as late as the 31st of December 1858, as far as this record show’s, the “factory account” showed the true balance then due Gary. But that could not preclude him from receiving his share in 1859, or subsequently, whenever the profits were realized.
But the cost of tobacco credited to “ factory account” is debited to “ adventure to California; ” and as the returns are received, must necessarily be credited to the same. This does not show that the firm in making that entry intended to withhold from Gary his share of the net profits, or to deny his right to it. This evidently appears from the fact that the entry, upon shipment of 1857, to California, was made in the same way, and one-third of the net profits was credited to Hudson, and one-fourth of the two-thirds was credited to Gary. And if so, his administrator, in agreeing to take the balances shown by “factory account” and “factory balances” as true, if his attention had been called especially to the entry aforesaid, could not have interpreted it as an exclusion or denial of his intestate’s right to the one-fourtli part of the net profits on the tobacco shipped to California, when the returns were received and the profits realized. It was proper that this transaction should be kept-separate from other transactions of the factory, in order to ascer *429 tain Hudson’s share of the net profits. When that was deducted, the net profit of the firm which remained might be carried back to “factory balance,” and thence to “ profit and loss,” ivhich is the summing up of the balances of all the accounts, to show what profits there are for division; or, to avoid that circuity, it might be carried directly to “ profit and loss,” as seems to have been done with the profit on the shipment to California in 1857, which was afterwards divided, and one-fourth ci’edited to John G. E. Gary, who was then living. It would bo more regular, after the amount due Hudson was ascertained and deducted, especially if Gary was not a partner, and ivas entitled only to a share of the profit on manufactured tobacco, to carry the net profit of the firm (the two-thirds) to factory balance account, and to credit Guy, to the debit of “factory balance,” with his one-fourth part of the profit, and carry the bahmee to “ profit and loss ” account, to be divided between the members of the firm. And the administrator, when making this agreement, if his attention had been called to this matter at all, may well have concluded that, when the profits on the shipments of 1858 to California were realized, they would be credited to “factory,” on “factory balance” account. How’ever that may be, there is nothing in the terms of his agreement, or in any fair inference therefrom, to inhibit it. Hor does it appear that it was the intention of the administrator by this contract to surrender his intestate’s undoubted right to share in the profits realized from a part of the tobacco, and a very large portion of it, manufactured in 1858 and 1859. 2sTor is such the effect of his contract.
But, if the clause of the contract, which we have been considering, could be construed as restricting the plaintiff to the balance due on the 31st of December 1858, as shewn by “factory account,” and as excluding him from *430 a share of the profits on the manufactured tobacco shipped to California prior to that date, we think, from the conduct of the appellees and all the circumstances dis-by the record, that it was a deception practiced upon the administrator; and that in consenting to said contract-, he was not aware that it was liable to such a construction, or that he was surrendering the right of his intestate to one-fourth part of the profit realized upon any part- of the tobacco manufactured by the firm under his direction and management.
Mr. Osborne, in his answer, had sworn that the firm “ opened and kept upon their books a ‘factory account,’ which shows, correctly and compactly, for every year, the net profits realized upon manufactured tobacco, to one-fourth part of which Gary was entitled, in lieu of a fixed and stated salary, as compensation for his services.” Upon the recommendation of the commissioner, which was doubtless influenced by this asseveration of Osborne in his answer — (for he says he had carefully examined the papers in the cause before he recommended to the parties the terms of adjustment — though he had only partially examined the books &c. of the firm) — the said recommendation of the commissioner, and also the representation of Osborne, (which was not true, if it excluded the profits on the manufactured tobacco shipped to California,) the administrator acceded to the recommendation of the commissioner.
The administrator was entitled to a full and truthful disclosure from the appellees ; and they were hound by the sacred obligations of trust to a dead man’s estate, to make a truthful disclosure. It was made under the •sanctity of an oath; and the plaintiff, upon the faith of it, accepted the terms wThich were recommended. It will be remembered that the want of candor in other representations and disclosures was not then known. The *431 •.plaintiff’s intestate had died suddenly, and left no trace ■ or evidence of his relation to the business of James Chieves, or of his just demands against the firm. They refused to allow the plaintiff access to tlieir books, correspondence, &e., to obtain information; but undertook to give him, personally, such information as they chose. And he had to file his bill in chancery against them. Air. Osborne, with his answer, filed an account as an exhibit, showing a balance of §23,999.72, of which he says: “This respondent avers that said account is a true abstract of said Gary’s account on the books of the firm, . and respectfully submits that the plaintiff is not entitled to any further account, and certainly is not entitled to the production of any of the books and papers of said firm, unless he can by proof or affidavit lay the foundation for the belief that said books and papers would, if produced, establish said account to be erroneous.” Of this account Air. Chieves says : “The account filed with the answer of the defendant Osborne is made up from the books, and is a true and correct account of the cre- • dits to which Gary is entitled, and of the sums of money with which he should be charged, and shows truly the balance due him, and is adopted as part of this answer.” Yet the commissioner, in stating an account from their books, shows a balance of §55,281.50, which he reports to the court, and which is confirmed by the court, w'ithout an exception. Afterwards, in the statement of the subsequent accounts, Air. Chieves exhibits an account of the transactions of 1859, showing no profit, but a loss of $1,721.68 for that year. Yet the commissioner reports a profit of §9,569.03, exclusive of the profit on the tobacco shipped to California, which is confirmed by the court; and we think correctly.
If these exposures had been made before the agreement in question was entered into by the plaintiff, they would *432 have been sufficient to throw him upon his guard. But they were not; and he having no evidence in his possession, and retying upon the appellees for information, if they misled him into a contract, by uncandid disclosures, to the wrong and injury of his intestate’s estate, the court is of opinion that they should not, in conscience and equity, be allowed to take advantage of it.
The court is therefore of opinion that there is no error in the decree of the Circuit court, and that the decree of the District court, so far as it reverses it, is erroneous. Let the decree of the District court, so far as it reverses, the decree of the Circuit court, be reversed; and the-decree of the Circuit court be affirmed; and the cause-be remanded to the Circuit court of Petersburg, for further proceedings to be had therein, in conformity with this opinion.
Decree or District court or appeals reversed.